# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VINCENT VARBARO, Derivatively on Behalf of Nominal Defendant PIEDMONT LITHIUM INC. F/K/A/ PIEDMONT LITHIUM LIMITED,<br><br>            Plaintiff,<br><br>    v.<br><br>KEITH D. PHILLIPS, BRUCE CZACHOR, GREGORY SWAN, JEFFREY ARMSTRONG, JORGE M. BERISTAIN, TODD HANNIGAN, IAN MIDDLEMAS, ANASTASIOS ARIMA, and LEVI MOCHKIN,<br><br>          Defendants,<br><br>    and<br><br>PIEDMONT LITHIUM INC. F/K/A/ PIEDMONT LITHIUM LIMITED,<br><br>          Nominal Defendant. | Case No. 1:21-cv-5754<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Vincent Varbaro ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Piedmont Lithium Inc. f/k/a/ Piedmont Lithium Limited ("Piedmont" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Piedmont with the U.S.

Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.     NATURE AND SUMMARY OF THE ACTION

1.      Piedmont holds a 100% interest in the Piedmont Lithium Project located within the Carolina Tin-Spodumene Belt in North Carolina. The area provided most of the western world's lithium between the 1950s and 1980s and is described as one of the largest lithium regions in the world.

2.      For years, the Company assured that it was applying for and obtaining the requisite permits for the Piedmont Lithium Project.

3.      On July 20, 2021, Reuters reported that Piedmont "has not applied for a state mining permit or a necessary zoning variance in Gaston County, just west of Charlotte, despite telling investors since 2018 that it was on the verge of doing so." According to the article, a majority of the board of commissioners said, "they may block or delay the project because Piedmont has not told them what levels of dust, noise and vibrations will occur, nor how water and air quality would be affected."

4.      On this news, the Company's stock price fell $12.56, or nearly 20%, to close at $50.52 per share on July 20, 2021, on unusually heavy trading volume.

5.      These revelations precipitated the filing of a securities class action in this District against Piedmont and certain of the defendants named herein, captioned *Skeels v. Piedmont Lithium Inc. f/k/a/ Piedmont Lithium Limited, et al.*, Case No. 21-cv-04161 (the "Securities Class Action").

6.      At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations because, among other things, Phillips, Armstrong, and Beristain were affirmatively aware of

2

significant developments in its core business, the Piedmont Lithium Project, and the deteriorating relationship with local officials which would hinder the permitting process. As a result, a majority of the Board could not disinterestedly investigate whether their conduct constituted breaches of fiduciary duties under Delaware law.

## II.   JURISDICTION AND VENUE

7.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) as complete diversity exists between Plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.   PARTIES

**Plaintiff**

9.   Plaintiff Vincent Varbaro purchased Piedmont's American Depositary shares ("ADSs") in January 2021 and automatically became a stockholder, when, as set forth below, Piedmont completed its redomiciliation. Plaintiff has continuously owned his Piedmont stock since that date. He currently owns 57 shares. Plaintiff is a citizen of Michigan.

**Nominal Defendant**

10.   Nominal Defendant Piedmont is a Delaware corporation with its principal executive offices located at 32 North Main Street, Suite 100 Belmont, North Carolina 28012. The Company's common stock trades on the NASDAQ under the symbol "PLL." On May 17, 2021, in connection with Piedmont's redomiciliation from Australia to the United States, holders of

3

Piedmont's ADSs received one share of common stock for each ADS.  Piedmont is a citizen of Delaware and North Carolina.

**Defendants**

11.     Defendant Keith D. Phillips ("Phillips") has served as the President and Chief Executive Officer ("CEO") of the Company since July 2017.  He is named as a defendant in the Securities Class Action.  Phillips is a citizen of Florida.

12.     Defendant Bruce Czachor ("Czachor") has served as the Company's Vice President and General Counsel since December 2018.  He is named as a defendant in the Securities Class Action.  Czachor is a citizen of New Jersey.

13.     Defendant Gregory Swan ("Swan") has served as Secretary of the Company snice October 2012 and served as Chief Financial Officer ("CFO") of the Company until approximately June 2021. He is named as a defendant in the Securities Class Action.  Swan is a citizen of Australia.

14.     Defendant Jeffrey Armstrong ("Armstrong") has served as a director of the Company since August 2018.  Armstrong is a citizen of North Carolina.

15.     Defendant Jorge M. Beristain ("Beristain") has served as a director of the Company since May 2018.  Beristain is a citizen of New York

16.     Defendant Todd Hannigan ("Hannigan") has served as a director of the Company since February 2021.  Hannigan is a citizen of Australia.

17.     Defendant Ian Middlemas ("Middlemas") served as a director of the Company from September 2009 to December 2020.  Middlemas is a citizen of Australia.

18.     Defendant Anastasios Arima ("Arima") served as a director of the Company from October 2016 to June 2021.  Arima is a citizen of North Carolina.

19.     Defendant Levi Mochkin ("Mochkin") served as a director of the Company from April 2006 to June 2021.  Mochkin is a citizen of Los Angeles.

20.     Defendants Phillips, Czachor, Swan, Armstrong, Beristain, Hannigan, Middlemas, Arima, and Mochkin are sometimes referred to hereinafter as the "Individual Defendants."

**Relevant Non-Parties**

21.     Claude Demby ("Demby") has served as a director of the Company since June 2021.

22.     Susan Jones ("Jones") has served as a director of the Company since June 2021.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

23.     By reason of their positions as officers, directors, and/or fiduciaries of Piedmont and because of their ability to control the business and corporate affairs of Piedmont, at all relevant times, the Individual Defendants owed Piedmont and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Piedmont in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Piedmont and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Piedmont and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Piedmont, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive,

managerial, and directorial positions with Piedmont, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

25.     To discharge their duties, the officers and directors of Piedmont were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Piedmont were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     SUBSTANTIVE ALLEGATIONS

26.     Piedmont holds a 100% interest in the Piedmont Lithium Project (the "Project") located within the Carolina Tin-Spodumene Belt ("TSB") in North Carolina. The area provided most of the western world's lithium between the 1950s and 1980s and is described as one of the largest lithium regions in the world.

27.     In May 2021, Piedmont Lithium Ltd., a public company incorporated under the laws of Western Australia, completed a redomiciliation with Piedmont Lithium Inc., a Delaware corporation. As a result, the ultimate parent company and its wholly owned subsidiaries were incorporated in Delaware.

**A.      The Individual Defendants Cause the Company to Issue Materially Misleading Statements**

28.     On March 16, 2018, the Individual Defendants caused Piedmont to file a Registration Statement on Form 20-F with the SEC. It was signed by defendant Phillips. The report discussed the requirement to obtain governmental permits and certain risks associated with permits and relationships with local officials:

> ***We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming.***
>
> We are required to obtain and renew governmental permits for our exploration activities and, prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits. Obtaining and renewing governmental permits is a complex and time-consuming process. The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority. We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations. Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties, which in turn could materially adversely affect our future revenues and profitability. In addition, key permits and approvals may be revoked or suspended or may be changed in a manner that adversely affects our activities. Private parties, such as environmental activists, frequently attempt to intervene in the permitting process and to persuade regulators to deny necessary permits or seek to overturn permits that have been issued. Obtaining the necessary governmental permits involves numerous jurisdictions, public hearings and possibly costly undertakings. These third-party actions can materially increase the costs and cause delays in the permitting process and could cause us to not proceed with the development or operation of a property. ***In addition, our ability to successfully obtain key permits and approvals to explore for, develop, operate and expand operations will likely depend on our ability to undertake such activities in a manner consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law.*** Our ability to obtain permits and approvals and to successfully operate in particular communities may be adversely affected by real or perceived detrimental events associated with our activities.

(First emphasis in original)[1]

---

[1] Unless otherwise stated, all emphasis in bold and italics is added.

29.     On June 7, 2018, the Individual Defendants caused Piedmont to issue a press release announcing the completion of Phase 3 drilling at its Core property in the TSB. It stated, in relevant part, that "[t]he necessary state permits have been received and drilling is underway at the Sunnyside Property with one hole completed."

30.     On June 14, 2018, the Individual Defendants caused Piedmont to issue a press release announcing a maiden mineral resource estimate at its Core property in the TSB. It stated, in relevant part:

> Piedmont is now focused on the completion of the Scoping Study which is expected in Q3 2018 and will reflect the Company's strategy of building an integrated lithium processing business based on proven, conventional technologies and benefitting from the inherent advantages of Piedmont's strategic North Carolina location, including;

| | | | |
|---|---|---|---|
| ✓ | Low cost power and gas | ✓ | Cost-competitive, highly skilled local labour |
| ✓ | Abundant transportation infrastructure | ✓ | No camp or fly-in/fly-out requirements |
| ✓ | Readily available and low-cost reagents | ✓ | Proximity to low cost service infrastructure |
| ✓ | Low state and federal taxes | ✓ | No state or federal royalties or mineral tax |
| ✓ | ***Strong local government support*** | ✓ | Privately-owned lands |

31.     On July 19, 2018, the Individual Defendants caused Piedmont to issue a press release regarding the scoping study results for the Piedmont Lithium Project. Regarding the permitting timeline, the Company stated:

**Environmental and Social Impact Assessment**

HDR Engineering has been retained by Piedmont to support permitting activities on the project.  HDR completed a critical issues analysis of the Project in February 2018 which identified the various local, state, and federal permits which will be required to commence mining and concentrator activities.

Threatened and endangered species and habitat surveys were started in February 2018 and are expected to conclude by the end of summer 2018.  To date no instance of threatened or endangered species has been noted.

Baseline activities required to submit a 404 permit were started in April 2018 and wetlands inventory work was completed in May 2018. A jurisdictional determination request was submitted to the US ACE in May 2018.

Monitoring, observations and pump wells were installed on the property in June and July 2018. Observations and pump tests will commence in July 2018.

Piedmont has authorised HDR to undertake a detailed cultural survey of the site at the request of the North Carolina State Historical Preservation Office (SHPO).

***HDR will start a 404 permit application and mining permit application process upon completion of this Scoping Study.***

\* \* \*

Regionally, North Carolina was named by Forbes Magazine as the #1 state for business in 2017. ***Piedmont has initiated discussion with the Gaston County Economic Development Commission (EDC) to assist in coordination of permitting and interface with utility and rail providers.*** Gaston County local government actively recruits manufacturing businesses to the region. The county relies heavily on manufacturing for employment (26%) and is generally expected to support the vertically-integrated project.

32.　　On September 13, 2018, the Individual Defendants caused Piedmont to issue a press

release announcing updated scoping study results which improved the economics of the Project.

Regarding the permitting timeline, the press release stated:

**Environmental and Social Impact Assessment**

HDR Engineering has been retained by Piedmont to support permitting activities on the project. HDR completed a critical issues analysis of the Project in February 2018 which identified the various local, state, and federal permits which will be required to commence mining and concentrator activities.

Threatened and endangered species and habitat surveys were started in February 2018 and are expected to conclude by the end of summer 2018. To date no instance of threatened or endangered species has been noted.

Baseline activities required to submit a 404 permit were started in April 2018 and wetlands inventory work was completed in May 2018. A jurisdictional determination request was submitted to the US ACE in May 2018.

Monitoring, observations and pump wells were installed on the property in June and July 2018. Observations and pump tests commenced in July 2018.

Piedmont has authorised HDR to undertake a detailed cultural survey of the site at the request of the North Carolina State Historical Preservation Office (SHPO).

**HDR started preparation of a 404 permit application and mining permit application in September 2018.**

\*         \*         \*

Regionally, North Carolina was named by Forbes Magazine as the #1 state for business in 2017. **Piedmont has initiated discussion with the Gaston County Economic Development Commission (EDC) to assist in coordination of permitting and interface with utility and rail providers.** Gaston County local government actively recruits manufacturing businesses to the region. The county relies heavily on manufacturing for employment (26%) and is generally expected to support the vertically-integrated project.

33.      On September 26, 2018, the Individual Defendants caused Piedmont to file its 2018 annual report as an exhibit to a Form 6-K filed with the SEC. The report stated that Piedmont had "Commenced permitting on the Project for all federal, state and local permits, which is targeted for completion in 2019." Moreover, a "Message from the CEO" included a statement touting the "stable and investment friendly jurisdiction" as a "fundamental advantage" for the Project, stating:

**The Scoping Study reinforced the fundamental advantages of our location in North Carolina, USA:**

- **Stable and investment friendly jurisdiction** – stable legal regime, established permitting process for mining operations, with low corporate taxes and no state mining royalties.

While our results to date have laid a solid foundation for our success, it is Piedmont's future which I find most exciting. We have several important activities already underway or pending over the coming months, including:

- **Resource growth** – we aim to expand the Project's life by adding resources at our Core property, while also hoping to identify resources on our Sunnyside and Central properties, and additional properties we may add in the future;

- **Permitting** – we are **actively engaged with local, state and federal regulators in advance of a comprehensive permitting submission targeted for late-2018**;

10

34.     On October 31, 2018, the Individual Defendants caused Piedmont to file its annual report for the year ended June 30, 2018 on Form 20-F with the SEC (the "2018 20-F"). It contained certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by defendants Phillips and Swan attesting to the accuracy of the financial statements and the disclosure of all material facts. Regarding permitting, it stated:

> We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming.
>
> We are required to obtain and renew governmental permits for our exploration activities and, prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits. Obtaining and renewing governmental permits is a complex and time-consuming process. *The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority.* We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations. Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties, which in turn could materially adversely affect our future revenues and profitability. In addition, key permits and approvals may be revoked or suspended or may be changed in a manner that adversely affects our activities.
>
> . . . *In addition, our ability to successfully obtain key permits and approvals to explore for, develop, operate and expand operations will likely depend on our ability to undertake such activities in a manner consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law.* Our ability to obtain permits and approvals and to successfully operate in particular communities may be adversely affected by real or perceived detrimental events associated with our activities.

35.     On January 10, 2019, the Individual Defendants caused Piedmont to issue a press release entitled "Piedmont Lithium Submits Permit Applications," which announced the submission of the "Section 404 Standard Individual Permit application to the US Army Corps of Engineers" as well as the submission of "an application for a Section 401 Individual Water QUality Certification to the North Carolina Division of Water Resources." It further stated that "Piedmont

expects to submit the balance of permit applications required to commence mining operations to various state and local agencies within the first half of 2019."

36.     On April 9, 2019, the Individual Defendants caused Piedmont to issue a press release announcing a project development update, which stated that "[t]he Company remains on schedule . . . to receive required permits and regulatory approvals by year-end." Specifically, it stated:

> Permitting Activities Proceeding as Anticipated
>
> The public comment period for the Company's Section 404 Standard Individual Permit application to the US Army Corps of Engineers (USACE) concluded in February 2019. Piedmont has received the comments from USACE and other regulatory agencies and will provide responses by May 31, 2019. **Piedmont is also proceeding with state and local permit applications.** The Company will undertake a series of community engagement meetings in the coming months and **anticipates applying for a North Carolina state mining permit and Gaston County conditional zoning in Q3 2019.**
>
> **The federal and state reviews are both proceeding as expected and the Company remains confident that the permitting processes will be successfully concluded by year-end 2019.**

37.     On August 7, 2019, the Individual Defendants caused Piedmont to issue a press release announcing the results of an updated scoping study for its lithium project. Among other things, the Company stated: "A mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months." It also stated:

> Background studies undertaken in support of permit applications have been constructive, and the conclusions reached in each individual study to date have met the requirements which would normally support permit approval.
>
> Piedmont maintains an active community engagement program including local, state, and federal elected officials, community groups, private individuals, and local media. Community engagement will continue through the permitting, development, and operations phases of the Project.

38.     On October 30, 2019, the Individual Defendants caused Piedmont to file its annual report on Form 20-F for the period ended June 30, 2019 with the SEC (the "2019 Annual Report"). Regarding permitting, the Company stated:

> **We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming.**
>
> We are required to obtain and renew governmental permits for our exploration activities and, prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits. Obtaining and renewing governmental permits is a complex and time-consuming process. ***The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority.*** We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations. Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties, which in turn could materially adversely affect our future revenues and profitability. In addition, key permits and approvals may be revoked or suspended or may be changed in a manner that adversely affects our activities. . . . Our ability to obtain permits and approvals and to successfully operate in particular communities may be adversely affected by real or perceived detrimental events associated with our activities.

39.     On November 26, 2019, the Individual Defendants caused Piedmont to announce that it had received "a Clean Water Act ('CWA') Section 404 Standard Individual Permit ('Section 404 Permit') from the US Army Corps of Engineers ('USACE') for the Company's 100% owned Piedmont Lithium Project . . ." The permit followed an environmental assessment completed "based on Piedmont's December 2018 permit application and the Company's responses to agency and public comments."

40.     On October 13, 2020, the Individual Defendants caused Piedmont to file its annual report on Form 20-F with the SEC for the period ended June 30, 2020 (the "2020 Annual Report"). As to permitting, the Company stated, in relevant part:

*We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming.*

We are required to obtain and renew governmental permits for our exploration activities and, prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits. Obtaining and renewing governmental permits is a complex and time-consuming process. The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority. We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations. Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties, which in turn could materially adversely affect our future revenues and profitability. In addition, key permits and approvals may be revoked or suspended or may be changed in a manner that adversely affects our activities. . . . Our ability to obtain permits and approvals and to successfully operate in particular communities may be adversely affected by real or perceived detrimental events associated with our activities.

41.     On January 29, 2021, the Individual Defendants caused Piedmont to file its December 2020 quarterly report as Exhibit 99.1 to a Form 6-K filed with the SEC, in which defendant Phillips was quoted as saying, in relevant part:

"Following our highly successful equity offering in October, Piedmont enters 2021 with a strong balance sheet that will enable the Company to meet its development objectives for the coming year. Our expanded team continues to do a great job on the ground in North Carolina in mineral exploration, metallurgical testwork, technical studies, and permitting that may make it possible for Piedmont to begin construction of our project by the end of this year. We expect 2021 will be a pivotal year for Piedmont Lithium, and we are excited about the months ahead."

42.     The above statements in ¶¶ 28-41 were materially misleading because they failed to disclose: (i) that Piedmont lacked local support for its lithium project; (ii) that Piedmont failed to file proper applications for permits with the relevant governmental authorities; and (iii) that, as a result of the foregoing, Piedmont was unlikely to obtain permits on its stated timeline.

### B.     The Truth Begins to Emerge

43.     On July 20, 2021, *Reuters* published an article entitled "In push to supply Tesla, Piedmont Lithium irks North Carolina neighbors." The article reported that Piedmont "has not applied for a state mining permit or a necessary zoning variance in Gaston County, just west of Charlotte, despite telling investors since 2018 that it was on the verge of doing so." According to the article, a majority of the board of commissioners said, "they may block or delay the project because Piedmont has not told them what levels of dust, noise and vibrations will occur, nor how water and air quality would be affected." Specifically, the article stated:

> Piedmont last autumn signed a deal to supply U.S. electric automaker Tesla Inc. with lithium sourced from its deposits in North Carlina, sending the company's stock up tenfold.

> Piedmont has also hired investment banks to find investors for its $840 million project, which would include an open-air pit more than 500 feet (152 m) deep and facilities to produce lithium-based electric vehicle (EV) battery chemicals.

> ***The company, however, has not applied for a state mining permit or a necessary zoning variance in Gaston County, just west of Charlotte, despite telling investors since 2018 that it was on the verge of doing so.***

> ***Five of the seven members of the county's board of commissioners, who control zoning changes, say they may block or delay the project because Piedmont has not told them what levels of dust, noise and vibrations will occur, nor how water and air quality would be affected.***

> Shares of the company fell as much as 21% on Tuesday after the Reuters story.

> "Piedmont has sort of put the proverbial cart before the horse," said Tom Keigher, chair of the board of commissioners. "Why in the world would they make this deal with Tesla before they even have approval for the mine?"

> Piedmont said it waited to approach officials in order to refine its plans - it published a third iteration last month - and to secure a customer to show that the mine could stay open for its projected 20-year lifespan.

> "We finally have a project to debut and really talk about," said Keith Phillips, Piedmont's chief executive officer.

"Maybe it would have been better had (commissioners) been in the loop constantly. We didn't really have the time or resources to do it and we didn't even know what to tell them, until now."

***The deteriorating relationship between Piedmont and county leaders*** reflects broader tension in the United States as resistance to living near a mine clashes with the potential of EVs to mitigate climate change.

\*        \*        \*

In September 2018, Piedmont told investors it expected to obtain permits by the end of 2019. In August 2019, executives said they would apply for permits and rezoning "in the coming months."

Piedmont said both times it was "not aware" of any reason why the county would not approve zoning changes, even though it had yet to present any information to commissioners. In December, Piedmont said it expected to receive local zoning approval before the end of June. …

Piedmont had been set to meet with commissioners in March, but canceled with three days' notice, further straining the relationship. Piedmont said it canceled that meeting in order to further refine its plans.

"This has been the worst rollout of a project from a company I've ever seen," said Chad Brown, a commissioner who opposes the mine.

44.     On this news, the Company's stock price fell $12.56, or nearly 20%, to close at

$50.52 per share on July 20, 2021, on unusually heavy trading volume.

## VI.    DAMAGES TO THE COMPANY

45.     As a direct and proximate result of the Individual Defendants' conduct, Piedmont

has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)      Any funds paid to settle the Securities Class Action; and

b)      Costs incurred from compensation and benefits paid to the defendants who

have breached their duties to Piedmont.

46.     In addition, Piedmont' business, goodwill, and reputation with its business partners,

regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted

the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

47.     The actions complained of herein have irreparably damaged Piedmont' corporate image and goodwill.  For at least the foreseeable future, Piedmont will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Piedmont' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

48.     Plaintiff brings this action derivatively in the right and for the benefit of Piedmont to redress injuries suffered, and to be suffered, by Piedmont as a direct result of breaches of fiduciary duty by the Individual Defendants.  Piedmont is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

49.     Plaintiff will adequately and fairly represent the interests of Piedmont in enforcing and prosecuting its rights.

50.     Plaintiff has continuously been a shareholder of Piedmont at times relevant to the wrongdoing complained of and is a current Piedmont shareholder.

51.     When this action was filed, Piedmont' Board of Directors consisted of defendants Phillips, Armstrong, Beristain, Hannigan, Demby, and Jones.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

52.     Phillips is the Company's CEO, and therefore is not independent under NASDAQ listing rules.  As an employee, Phillips derives substantially all of his income from his employment with Piedmont, thus could not disinterestedly consider a demand for action that might require him

to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  Moreover, as CEO and as alleged herein, Phillips personally issued the misleading statements alleged herein and faces a substantial risk of liability in the Securities Class Action.  As a result, Phillips would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

53.    Each of Phillips, Armstrong, and Beristain managed the Company and was affirmatively aware of significant developments in its core business. The Piedmont Lithium Project in TSB is the "centerpiece" of Piedmont's operations, according to its SEC filings. Accordingly, the truth regarding the permitting timeline and the deteriorating relationship with local officials was known by each of Phillips, Armstrong, and Beristain at all relevant times. The decision of each of Phillips, Armstrong, and Beristain to permit the misleading statements and the concealment of material facts were not valid exercises of business judgment and demand is excused on that basis.

## COUNT I

**Against Defendants Phillips, Czachor, and Swan for Breach of Fiduciary Duty**

54.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

55.    Defendants Phillips, Czachor, and Swan each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Piedmont' business and affairs, particularly with respect to issues as fundamental as public disclosures.

56.    The conduct by defendants Phillips, Czachor, and Swan set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants

18

Phillips, Czachor, and Swan intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Piedmont.

57.     In breach of their fiduciary duties owed to Piedmont, defendants Phillips, Czachor, and Swan willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

58.     In particular, defendants Phillips, Czachor, and Swan knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

59.     As a direct and proximate result of the breaches of their fiduciary obligations by defendants Phillips, Czachor, and Swan, Piedmont has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

**Against the Defendants Phillips, Czachor, Swan, Armstrong, Beristain, Hannigan, Middlemas, Arima, and Mochkin for Breach of Fiduciary Duty**

60.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

61.     These Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Piedmont' business and affairs, particularly with respect to issues as fundamental as public disclosures.

62.     These Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  These Defendants intentionally or

recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Piedmont.

63.     In breach of their fiduciary duties owed to Piedmont, these Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

64.     In particular, these Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

65.     As a direct and proximate result of these Defendants' breaches of their fiduciary obligations, Piedmont has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.   As a result of the misconduct alleged herein, defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Piedmont, demands judgment as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Piedmont and that plaintiff is an adequate representative of the Company;

B.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.     Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Piedmont;

D.     Directing Piedmont to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect

Piedmont and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Piedmont' oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Piedmont to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Piedmont has an effective remedy;

F.      Awarding to Piedmont restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: October 14, 2021          By:    /s/Benjamin I. Sachs-Michael    
                                 **GLANCY PRONGAY & MURRAY LLP**
                                 Benjamin I. Sachs-Michaels
                                 712 Fifth Avenue
                                 New York, New York 10019
                                 Telephone: (212) 935-7400
                                 E-mail: bsachsmichaels@glancylaw.com

                                         -and-

                                 Robert V. Prongay
                                 Pavithra Rajesh
                                 1925 Century Park East, Suite 2100
                                 Los Angeles, California 90067
                                 Telephone: (310) 201-9150
                                 E-mail: rprongay@glancylaw.com
                                         prajesh@glancylaw.com

                                 *Counsel for Plaintiff Vincent Varbaro*

## **VERIFICATION**

I, Vincent Varbaro, do hereby verify that I am a holder of common stock Piedmont Lithium Inc. f/k/a/ Piedmont Lithium Limited, and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Date: 10/8/2021

_____

Vincent Varbaro